# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

PAGE, DORIAN, J.                    Plaintiff(s),

vs.

POLAR SEMICONDUCTOR LLC

Defendant(s).

(Enter the full name(s) of ALL plaintiffs
and defendants in this lawsuit. Please
attach additional sheets if necessary.)

Case No. ____26-cv-700-KMM/DJF____
(To be assigned by Clerk of District
Court)

DEMAND FOR JURY TRIAL
YES  X    NO ___

**EMPLOYMENT DISCRIMINATION COMPLAINT**

SCANNED
JAN 2 7 2026
U.S. DISTRICT COURT MPLS

RECEIVED
JAN 2 6 2025
CLERK, U.S. DISTRICT COURT
MINNEAPOLIS, MINNESOTA

## PARTIES

1. List your name, address and telephone number. Do the same for any additional plaintiffs.

   a. Plaintiff

      Name                DORIAN J. PAGE

      Street Address      10040 PENN AVE S APT 10

      County, City        HENNEPIN, BLOOMINGTON

      State & Zip Code     MINNESOTA 55431

      Telephone Number    (214)491-7479

2. List all defendants. You should state the full name of the defendant, even if that defendant is
   a government agency, an organization, a corporation, or an individual. Include the address
   where each defendant may be served. Make sure that the defendant(s) listed below are

identical to those contained in the above caption.

a. Defendant No. 1

Name                POLAR SEMICONDUCTOR LLC

Street Address      2800 E OLD SHAKOPEE RD

County, City        HENNEPIN BLOOMINGTON

State & Zip Code    MINNESOTA, 55425
b. Defendant No. 2

Name                _____

Street Address      _____

County, City        _____

State & Zip Code    _____

**NOTE: IF THERE ARE ADDITIONAL PLAINTIFFS OR DEFENDANTS, PLEASE PROVIDE THEIR NAMES AND ADDRESSES ON A SEPARATE SHEET OF PAPER.**
**Check here if additional sheets of paper are attached: ☐**
**Please label the attached sheets of paper to correspond to the appropriate numbered paragraph above (e.g. Additional Defendants 2.c., 2.d., etc.)**

JURISDICTION

The Court has jurisdiction over this action under 28 U.S.C. § 1331.

3. This employment discrimination lawsuit is based on (check only those that apply):

a. X Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, *et. seq.*, for employment discrimination on the basis of race, color, religion, gender, or national origin. **NOTE**: *In order to bring suit in federal district court under Title VII, you must first obtain a right to sue letter from the Equal Employment Opportunity Commission (EEOC).*

b. ___ Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. §§ 621, *et. seq.*, for employment discrimination on the basis of age (age 40 or older). **NOTE**: *In order to bring suit in federal district court under the Age Discrimination in Employment Act, you must first file charges with the Equal Employment Opportunity Commission*

2

*(EEOC).*

c. ___ Americans with Disabilities Act of 1990, as amended, 42 U.S.C. §§ 12101, *et. seq.*, for employment discrimination on the basis of disability. **NOTE**: *In order to bring suit in federal court under the Americans with Disabilities Act, you must first obtain a right-to-sue letter from the Equal Employment Opportunity Commission (EEOC).*

d. —-- Rehabilitation Act of 1973, as amended, 29 U.S.C. §§ 701, *et. seq.*, for employment discrimination on the basis of a disability by an employer which constitutes a program or activity receiving federal financial assistance. **NOTE**: *In order to bring suit in federal district court under the Rehabilitation Act of 1973, you must first file charges with the appropriate Equal Employment Office (EEO) representative or agency.*

e. ___ Other (Please describe.)

_____

_____

_____

_____

4. If you are claiming that the discriminatory conduct occurred at a location other than the defendant's address above, please provide the following information on where the conduct occurred:

_____

(Street Address)          (City/County)          (State)          (Zip Code)

5. When did the discrimination occur? Please give the date or time period:

10/2023 - 12/19/2025

ADMINISTRATIVE PROCEDURES

6. Did you file a charge of discrimination against the defendant(s) with the Equal Employment Opportunity Commission or other federal agency?

a. X Yes          Date filed: 12/29/2025

b. ___ No

7. Have you received a Notice of Right-to-Sue Letter?

3

a.  X Yes  If yes, please attach a copy of the letter to this complaint.

b.  ____ No

NATURE OF THE CASE

8.  The conduct complained of in this law suit involves (check only those that apply):

a.  ___ Failure to hire me

b.  ___ Termination of my employment

c.  ___ Failure to promote me

d.  ___ Failure to accommodate my disability

e.  ___ Terms and conditions of employment differ from those of similar employees

f.  X  Retaliation

g.  ___ Harassment

h.  ___ Other conduct (please specify): _____

_____

_____

_____

i.  Did you complain about this same conduct in the charge of discrimination, referred to in number 6 above?

X  Yes  ___ No

9.  I believe that I was discriminated against because of my (check all that apply):

a.  ___ Race

b.  ___ Religion

c.  ___ National origin

4

d.  ___  Color

e.  ___  Gender

f.  ___  Disability

g.  ___  Age (my birth year is:_____)

h.  X  Other (please specify): Retaliation for engaging in protected

activity._____

i.  Did you state the same reason(s) in the charge of discrimination, referred to in number 6 above?

X  Yes  ___No

Describe in the space provided below the basic facts of your claim.  The description of facts should include a specific explanation of the conduct that you believe is discriminatory and describe how each defendant is involved in the conduct (i.e. how, where, and when).  Each paragraph must be numbered separately, beginning with number 10.  Please write each allegation of discrimination in a separately numbered paragraph.

10. During a shift passdown in October 2023, Manager Bob Stuart made a comment regarding a newly hired engineer. I withdrew from the conversation due to discomfort.

11. On November 17, 2023, I contacted HR Representative Tamera to inquire about an internal transfer to position R2885. The request was denied on the basis that I had not yet completed the company's six-month probationary period.

12. In the weeks following this request, my workload increased and workplace incidents

escalated. On November 22, 2023, while I was seated in my vehicle outside the facility, coworker Robert Burkhead spat at me.

13. I promptly reported the November 22, 2023 incident to Shane Spears, and the matter was escalated to then–Senior Director of HR Deborah Roberts. Facility security reviewed video footage of the incident. No disciplinary action was taken.

14. The response options provided required me to manage or avoid the situation independently. As a result, the incident remained unresolved.

15. Between November 23, 2023 and December 12, 2024, at approximately 19:00, 00:00, and 04:00, I experienced repeated tool alerts requiring maintenance intervention during a period when I was away from the equipment.

16. During this period, a total of approximately two hundred eighty-three (283) such alerts occurred. These alerts were delivered through a shared shift phone that I was required to carry at all times.

17. On or about December 12, 2024, I observed damage to work uniforms, including cuts consistent with the presence of loose razor blades in a smock staging area. I inquired whether any training or safety procedures existed regarding the use and disposal of razor blades.

18. Between December 12, 2024 and August 1, 2025, at approximately 19:00, 00:00, and

6

04:00, I experienced repeated tool alerts requiring maintenance intervention during a period when I was away from the equipment.

19. During this period, approximately one hundred thirty-six (136) such alerts occurred. These alerts were delivered through a shared shift phone that I was required to carry at all times.

20. During a shift passdown on August 1, 2025, I was informed that a disconnected cable had been found following the completion of preventive maintenance on tool TEL308.

21. Based on my experience, I questioned the feasibility of the cable becoming disconnected unintentionally, as disconnecting the cable requires deliberate action due to a safety release mechanism.

22. I communicated these concerns to Manager Bob Stuart by email, describing the condition observed and raising concerns regarding process reliability. Senior Manager Arthur Reever was copied on this communication.

23. Manager Stuart responded, stating, "Very strange, will keep an eye on this." No further follow-up or investigation was communicated to me.

24. Between August 1, 2025 and August 4, 2025, at approximately 19:00, 00:00, and 04:00, I experienced additional tool alerts requiring maintenance intervention during a period when I

7

was away from the equipment.

25. During this time frame, approximately twelve (12) such alerts occurred. These alerts were delivered through the same shared shift phone that I was required to carry.

26. In August 2025, I interviewed for an Equipment Manager position with Manager Bob Stuart and Senior Manager Arthur Reever.

27. During the interview, a comment was made regarding the work ethic of Conrad Vanasse, a D-shift Photo Area Lead Technician. Senior Manager Reever stated, "You work with Conrad, you know."

28. Following this interaction, I became increasingly withdrawn from the work environment and began seeking alternative employment.

29. In August 2025, while I was providing instruction and reviewing required materials with a newly hired technician, Alex Zhu stated, "he lies as much as he breathes."

30. After this statement, I limited my interactions with Mr. Zhu to those necessary to perform assigned job duties and interacted only when specifically requested.

31. Between August and September 2025, Lead Technician Conrad Vanasse engaged in repeated disruptive behavior during shift passdown meetings.

32. This behavior included yelling and slamming a desk in the presence of other employees. I found these incidents distressing and attempted to remove myself from the immediate area when possible.

33. Between August 2025 and September 2025, at approximately 19:00, 00:00, and 04:00, I experienced additional tool alerts requiring maintenance intervention during a period when I was away from the equipment.

34. During this time frame, approximately seventeen (17) such alerts occurred. These alerts were delivered through a shared shift phone that I was required to carry.

35. On September 12, 2025, while working on the recovery of laser power issues on tool KLASP1-302, I stepped away from my workstation to retrieve cycle wafers for testing.

36. When I returned, a set of Allen wrenches issued to me by the company was missing from the top of my toolbox.

37. I emailed the management team to report the missing tools and requested that team members be reminded to use assigned tools when performing their work. Manager David Butler responded by email stating, "I will follow up with my guys."

38. Following this incident, I became increasingly vigilant about the security of my tools during shifts.

39. During quarterly preventive maintenance on Omron robotic equipment in September 2025, an individual enabled motors while I was actively performing tasks, resulting in consecutive near-miss incidents.

40. On September 17, 2025, I emailed Engineer Sam Harvey and the Photo Maintenance distribution list requesting a separate system login to prevent a recurrence of the incident.

41. Engineer Harvey responded by email stating, "I will start getting that login set up. That shouldn't happen." No incident report was generated, and I was not interviewed regarding the near-miss events.

42. In October 2025, at approximately 19:00, 00:00, and 04:00, I experienced a tool alert requiring maintenance intervention during a period when I was away from the equipment.

43. The alert was delivered through the shared shift phone that I was required to carry.

44. In October 2025, during a shift passdown meeting, Manager Bob Stuart made the following statement: "What would be the politically correct way to say 'Jew'?"

45. Following this statement, I limited my participation in the meeting to responding only when questions were directed to me.

46. In October 2025, during a separate shift passdown meeting, a statement was made stating, "Sometimes you just need to beat one out," followed by laughter from those present.

47. After this statement, I further limited my participation in group discussions and focused on performing assigned job duties.

48. In October 2025, Omron robotic equipment was found in a non-localized state and positioned in a manner that required manual intervention.

49. At that time, the Obstacle Avoidance Multi Robot Server was disabled. I intervened to prevent potential scrap risk and to restore the system to a stable operating condition.

50. In October 2025, at approximately 19:00, 00:00, and 04:00, I experienced repeated tool alerts requiring maintenance intervention during a period when I was away from the equipment.

51. During that month, approximately thirty-one (31) such alerts occurred. These alerts were delivered through a shared shift phone that I was required to carry at all times.

52. On October 4, 2025, I contacted the Equal Employment Opportunity Commission (EEOC) to initiate an inquiry regarding workplace conditions and to protect my rights.

53. On October 9, 2025, I participated in a therapy session through Talkspace, during which I discussed workplace stressors and their impact on my sleep, work performance, and daily functioning.

54. On or about November 1, 2025, after raising concerns internally with Vice President of HR Jane Van Why, my matter was referred to Head of HR James Cram.

55. At that time, I requested that communications regarding my concerns be conducted through a confidential external email address. This request was approved.

56. Between November 3, 2025 and November 6, 2025, Head of HR James Cram requested documentation regarding my concerns and scheduled a meeting to discuss them.

57. In advance of the meeting, I provided a concise written summary of the issues I had raised. The summary was intended to outline key concerns and did not include a full incident log.

58. The meeting was held on November 6, 2025, at approximately 16:30.

59. Following the meeting, on November 6, 2025, at approximately 21:08, I sent a follow-up email expressing concerns regarding confidentiality, the risk of retaliation, and the emotional impact of the workplace conditions.

60. On November 8, 2025, I reported multiple safety-related incidents, including heated confrontations involving a technician and an operator, as well as a separate incident involving two lead technicians.

61. In that communication, I stated that I no longer believed the workplace to be safe and formally requested a mutual separation.

62. Between November 11, 2025 and November 12, 2025, HR acknowledged receipt of my request and scheduled a follow-up discussion.

63. During this period, I reiterated concerns regarding workplace instability and stated that I remained willing to work, including availability to work on Saturday, pending a decision by the company.

64. HR responded that the company would consider my request for formal separation.

65. On November 17, 2025, an EEOC Area Director contacted me regarding discrimination allegations and provided EEOC Form 5A.

66. In November 2025, at approximately 19:00, 00:00, and 04:00, I experienced a tool alert requiring maintenance intervention during a period when I was away from the equipment.

67. The alert was delivered through the shared shift phone that I was required to carry.

68. On November 22, 2025, while recovering tool INSP309, I stepped away from the workstation to retrieve a wafer wand to manually recover a wafer.

69. When I returned, my assigned laptop was rebooting. I reviewed the system event logs and observed an unexpected shutdown.

70. On November 22, 2025, while working on robotic equipment identified as "Rosie," the robot was localized and motors were enabled while I was performing tasks.

71. I immediately shut down the tool to prevent further risk.

72. Later on November 22, 2025, at approximately 21:13, robotic equipment identified as "R2D2" was found to be mislocalized multiple times.

73. I recorded video of the mislocalization for verification purposes and notified the incoming shift of the irregularities. The robot was shut down to prevent further issues.

74. During shift passdown on November 28, 2025, statements were made suggesting that I had not completed work on a different tool.

75. I responded that the work referenced had not been assigned to me and that no communication or delegation regarding that task had occurred.

14

76. At that time, I was actively engaged in shutting down and manually repositioning Omron robotic equipment due to compromised collision-avoidance functionality.

77. During the same passdown on November 28, 2025, Senior Technician John Duvio diverted the discussion to reference multiple medical incidents involving other employees.

78. On November 29, 2025, during a subsequent passdown, Senior Maintenance Technician John Duvio stated that the robotic system could be considered "all clear" despite ongoing collision-server disconnections and unsafe robot behavior.

79. The statement was made without engineer review or intervention, notwithstanding the unresolved system conditions.

80. On November 29, 2025, I was unable to clock in for my scheduled shift and contacted my supervisor to confirm my availability. I did not receive a response.

81. I then contacted Manager Bob Stuart. Following my prior escalation of repeated collision-avoidance server disconnections and unsafe robotic behavior, I was instructed to remain on-site.

82. On November 30, 2025, after reviewing my written escalation regarding a near-miss event, Senior Technician John Duvio stated to me, "Someone was definitely f***ing with

you."

83. During a shift passdown in November 2025, New Technician Steven Hillian stated, "Our Dorian took the weekend off." I did not respond to the statement.

84. On December 5, 2025, while I was working in the fab, I overheard IS/IT Technician Will Walker making mocking remarks in reference to my prior safety escalations. I did not respond.

85. On December 6, 2025, prior to shift passdown, I was speaking with Supervisor Clayton Reichart regarding a current emergency response team (ERT) event.

86. During that conversation, other members of the Photo Maintenance group entered the area and interrupted the discussion, preventing completion of the information exchange for the incoming shift.

87. On December 8, 2025, a formal demand letter requesting mutual separation was sent to the company.

88. On December 10, 2025, at approximately 20:47, I received a phone call from Supervisor Clayton Reichart requesting that I prepare tool WAFSORT304 for decommissioning and relocation. During that call, separation was also referenced.

16

89. I completed the requested task promptly and sent an email confirming completion.

90. On December 11, 2025, Head of HR James Cram rejected the demand letter in full, stating in writing that "Your client's demand is so far removed from anything Polar would consider that it doesn't appear a response is worthwhile."

91. On December 12, 2025, at approximately 18:30, my supervisor discussed the scope of my work and the assignment process with me.

92. During that discussion, I reiterated that I was available to perform tasks when directly assigned by management and referenced the completed assignment involving WAFSORT304 as an example.

93. I was informed that the discussion would be documented and reported. I agreed to that documentation.

94. On December 12, 2025, I attended a meeting during which job descriptions and job duties were presented to me. During the meeting, concerns were raised regarding my performance, and I was asked whether I could perform the duties described.

95. I responded that I was able to perform assigned duties subject to safety considerations related to previously identified robotic system issues. The meeting was then reframed by management as a clarification of job duties.

96. Following the meeting on December 12, 2025, I sent a follow-up email reiterating that I remained available to perform work when directly assigned by management and in a manner consistent with maintaining my protected activity.

97. Senior Manager Arthur Reever responded by email stating, "I genuinely want you to strongly consider your stance."

98. I replied that I remained available for assigned work in areas that did not intersect with the robotic system involved in a prior near-miss incident. In that response, I attached the earlier email thread I had submitted to Engineer Sam Harvey and the Photo Maintenance distribution list regarding the near-miss event.

99. On December 13, 2025, I was issued a final written warning for gross misconduct identified as insubordination and refusal to perform job duties, and I was placed on unpaid suspension. Following the meeting, I was escorted out through the common maintenance break area during passdown while groups of coworkers remained present, making the disciplinary action observable to others on shift.

100. The disciplinary action followed my refusal to perform work in areas I had previously raised as unsafe and after repeated requests to involve HR in addressing those concerns.

101. HR was not present at the meeting during which the disciplinary action was issued, though I was informed that HR had been consulted.

102. The Final Written Warning was subsequently rescinded.

103. Following the disciplinary action issued on December 13, 2025, HR contacted me on December 16, 2025, at approximately 14:43, to request a discussion regarding the underlying safety issue I had previously escalated.

104. The proposed discussion was described as informal, off the record, and without participation by legal counsel.

105. At the time of the outreach, I had not received documentation indicating that the previously reported safety concern had been formally investigated, mitigated, or resolved.

106. On December 18, 2025, at approximately 17:45, HR convened an informal meeting during which robot safety mechanisms, including sonar and collision-avoidance systems, were verbally described.

107. During the meeting, I acknowledged the general explanation of the safety mechanisms and stated that, under company whistleblower and safety policies, safety resolution requires formal investigation documentation, corrective action plans, and documented safety sign-off.

108. I reiterated that I remained available to perform assigned work in areas not affected by the previously reported robotic safety issues.

109. HR stated that my position could be characterized as a refusal to perform duties. I responded that my position was based on compliance with safety and whistleblower policies.

110. No formal documentation addressing the safety concern was provided following the meeting.

111. On December 19, 2025, I was again requested to participate in another informal meeting.

112. I declined the request and asked that further communication occur through formal channels.

113. My request was denied, and I was presented with a retroactive incident report.

114. On January 5, 2026, the Equal Employment Opportunity Commission issued a Notice of Right to Sue and deferred the safety-related aspects of my complaint to the Occupational Safety and Health Administration (OSHA).

115. On January 6, 2026, OSHA referred the matter to Minnesota OSHA (MNOSHA) for further handling.

116. On January 13, 2026, MNOSHA informed me that the employer asserted a "double remediation" position, stating that the disciplinary action had been rescinded and that lost

time would be compensated.

117. After engaging in protected activity, including reporting safety concerns, requesting HR involvement, and contacting the EEOC, I was subjected to materially adverse actions, including increased scrutiny, informal meetings framed as disciplinary, a Final Written Warning for alleged insubordination, unpaid suspension, and pressure to withdraw or reframe my safety concerns.

**Attach additional sheets of paper as necessary.**
**Check here if additional sheets of paper are attached: □**
**Please label the attached sheets of paper as Additional Facts and continue to number the paragraphs consecutively.**

REQUEST FOR RELIEF

State briefly and exactly what you want the Court to do for you and the amount of monetary compensation, if any, you are seeking.

WHEREFORE, Plaintiff respectfully requests that the Court:

a. Declare that Defendant retaliated against Plaintiff in violation of Title VII;

b. Award Plaintiff back pay, front pay in lieu of reinstatement if appropriate, and all other equitable relief necessary to make Plaintiff whole;

c. Award Plaintiff compensatory damages as permitted by law;

d. Award Plaintiff costs and attorney's fees pursuant to 42 U.S.C. § 2000e-5(k);

e. Grant such other and further relief as the Court deems just and proper.

21

Date: 01/27/2026

Signature of Plaintiff

Mailing Address
10040 PENN AVE S APT 10, BLOOMINGTON MN, 55431

Telephone Number   (214)491-7479

Note:   All plaintiffs named in the caption of the complaint must date and sign the complaint and provide his/her mailing address and telephone number.  Attach additional sheets of paper as necessary.